MEMORANDUM OF DECISION
On July 17, 1998, the Department of Children and Families ("DCF") filed a petition to terminate the parental rights of Veronica D. and Johnnie J. ("Johnnie J., Sr."), to their sons, Johnnie J., Jr., and Mykell J. On December 16, 1999, trial concerning the petition occurred in this court. Neither parent appeared at trial. For the reasons stated below, the court grants the petition.
FACTS
The court finds the following facts and credits the following evidence.
A. Background of the Case
Johnnie J., Jr. was born on July 27, 1990. In an August, 1994 incident, Veronica D. was intoxicated, fell to the ground with her son, and became unconscious. When she regained consciousness, she hit his head against a door frame and dropped him. As a result, DCF pursued a 96-hour hold. In a second incident, on November 11, 1994, a police officer observed her beating the CT Page 44 child in front of their apartment building. A neglect petition was filed. Johnnie J., Sr.'s whereabouts were unknown. The child was placed in foster care, where he has remained until the time of trial. Subsequently, on February 27, 1995, Veronica D. failed to appear for a court-ordered psychological evaluation and parent/child evaluation. On May 8, 1995, court-ordered Expectations of both parents were entered. Exh. 5. On June 19, 1995, Johnnie J., Jr.,'s custody was committed to DCF pursuant to a neglect adjudication. Extensions of his commitment were later ordered by the court.
Mykell was born on December 21, 1995. He was born with a life threatening illness, which both of his parents also have. Veronica D. and Mykell were placed at Crossroads, a substance abuse treatment program for mothers and their children. When she was unable to care for Mykell she was referred for a psychiatric evaluation at Yale-New Haven Hospital's Crisis Intervention Unit. When his mother started to decompensate psychiatrically, Mykell was voluntarily placed in a foster home on January 23, 1996, one month after his birth. Mykell has remained in foster care. Veronica D. left the Crossroads program, prior to completion. A neglected and uncared-for petition was filed concerning Mykell. Again, Johnnie J., Sr.'s whereabouts were unknown. On November 1, 1996, Mykell was committed to the care and custody of DCF. It was noted that he needed specialized care. Subsequently, the court ordered extensions of his commitment.
New court-ordered Expectations concerning Veronica D., which applied to both children, were entered by the court on January 22, 1997. Exh. 6. She did not comply with these, and neither parent complied with those previously ordered.
B. The Mother
Veronica D. was born in Bridgeport in 1963. She graduated from high school in 1981. She was unemployed after Johnnie J., Jr.'s birth in 1990. She has a substantial substance abuse history and was admitted to several substance abuse programs, but completed none prior to the filing of the petition.
Her criminal history includes assault convictions and a probation violation, as well as periods of incarceration in 1994 and 1997. See Exh. 3. Her residences have been transient.
The evaluation of Yale-New Haven Hospital in January, 1996 CT Page 45 resulted in diagnoses of psychotic disorder, schizoaffective disorder, a mood disorder, and cocaine and alcohol dependence. Subsequently, in spite of numerous referrals, she did not address her medical and mental health issues. She has maintained a long-term, turbulent and volatile relationship with Johnnie J., Sr.
C. The Father
Johnnie J., Sr. was born in Richmond, Virginia in 1956. He grew up primarily in New Jersey and then moved to Connecticut. He, too, has a history of substance abuse. In March, 1997, he threatened to blow up the DCF office in Bridgeport.
He has a history of psychiatric hospitalizations. He was stabbed when he was age 25 and has not been able to work since that injury.
His criminal history includes recent convictions for burglary, possession of narcotics, larceny, and threatening. Exh. 4. Earlier he had felony convictions for sale of narcotics, possession of narcotics, burglary, and failure to appear. Id. Other convictions preceded those. Id. He has been incarcerated at various points in time after 1990. Id.
After September 1997, his whereabouts became unknown to DCF. When he was subsequently incarcerated and brought to court for matters concerning the children, he did not seek contact with them. DCF made various efforts to locate him at different times, but was unsuccessful.
D. The Children
Johnnie J., Jr. is a bright, energetic child. He lives in the same foster home in which he was placed in August, 1995, a period of approximately four years and four months as of trial. He is in the fourth grade at school and does well academically.
Mykell was originally placed in a foster home for medically fragile children until he was medically cleared of the disease with which he was infected at birth. Since September, 1997, when he was reunited with his brother, Mykell and Johnnie J., Jr. have lived in the same foster home. Mykell is a very out-going four year old and attends a head start program.
Since being reunited, the children have developed a close bond CT Page 46 with each other and with their foster parents. Mr. Brunson, a DCF social worker, has observed the children at the foster home on four occasions. Neither child asks about their biological parents. They call their foster parents "Mommy" and "Daddy."
Johnnie has stated that he is scared that he and his brother will be removed from the foster home. At home visits, Mykell has cried, expressing his fears that he too will be removed from the home and separated from his brother. The foster parents have expressed a strong interest in adopting both children if they are legally free to be adopted.
E. Efforts at Rehabilitation and Reunification
The May, 1995 Expectations (Exh. 5) specified what the parents were required to do to "improve [their] chances of regaining, or keeping guardianship of [their] child permanently." Included were: (1) keep all appointments set by or with DCF; (2) visit the child as often as DCF permits; (3) participate in individual counseling; (4) participate in drug/alcohol evaluation; (5) follow recommendations; (6) sign releases as requested; (7) secure/maintain adequate housing and income; (8) no substance abuse; (9) no further involvement with criminal justice system, and (10) participate in parent/child interactive study and psychological evaluation. Id. Exh. 6, the subsequent Expectations, included similar provisions and added: "cooperate with evaluation by Bridgeport Mental Health and follow recommendations." The record reflects that meaningful compliance never occurred.
Services
Veronica D. was referred to various agencies for assistance, such as Southwest Community Center, Family Services-Woodfield, Guenster Rehabilitation Program, the ACCESS Program, Bridgeport Mental Health Center, and Liberation Program for substance abuse treatment, individual counseling, parenting, and medical care. She did not follow through. Her inability to remain drug free and sober impeded reunification efforts. The parents refused to address their domestic violence issues. She was discharged from inpatient substance abuse programs and shelters due to her noncompliant and violent behavior.
After her release for incarceration in August, 1997, she made no effort to contact DCF concerning the children. DCF was only CT Page 47 able to learn her whereabouts after contacting her probation officer. In May, 1998, a probation officer advised that she was at the Waterbury AIC and then in a halfway house; she was discharged for aggressive behavior towards residents and staff. Later in the summer, she was at a shelter in Bridgeport, which also discharged her. She became whereabouts unknown and the petition followed.
Johnnie J., Sr. was also offered several community-based programs to address his medical and mental health needs. For example, he did not follow through with referrals to Southwest Community Center, Family Services-Woodfield, and the Bridgeport Mental Health Center for substance abuse treatment, individual counseling, and medical treatment. Johnnie J., Sr. is in the latter stages of a life threatening disease and indicated that he was not physically well enough to care for the children.
Visitation
Beginning in 1994, the parents were offered monthly, supervised visitation, including during incarceration for Veronica D. for approximately one year, starting in March, 1996. When she engaged in a tirade, visits were reduced due to the fact that the children were frightened. Once she was released, she was again offered monthly visits; she attended three out of fifteen scheduled visits before the last in October, 1997.
Johnnie J., Sr. was also offered monthly visits. He appeared at two. His last visit was in March, 1997. During visits he interacted very little with the children. He became agitated when they cried as he attempted to hold them. Their fear of him provoked argument between him and Veronica D., causing an abrupt end to visits.
When transportation became a barrier, DCF either provided or paid for transportation to visits. DCF also made efforts to offer separate visits for the parents due to their history of domestic violence. The long-time DCF social worker for the family, Mr. Puebla, described the visits. Veronica D. would be tearful and explosive. Apparently, on occasion, she thought the children were "possessed by the devil" and would inspect them. Frequently, she would argue with Johnnie J., Sr. when he was there. Usually the visits had to be stopped since they were detrimental to the children. CT Page 48
The visits were clearly not productive. After her incarceration in the summer of 1997, she failed to appear for a scheduled visit in September, 1997. On October 29, 1997, at the last visit, she became agitated with the DCF worker who supervised the visit, then threatened the supervisor who was called to intervene. She was escorted from the building by security, leaving the children confused and in tears. Johnnie J., Jr. stated that he no longer wanted to visit with his parents.
Veronica D.'s last contact with DCF concerning the children occurred in February, 1998. DCF did make contact with Veronica D. again after she was incarcerated again in 1998. She has not sought visitation since October, 1997.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The statute does not define the term "reasonable." Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807,812-813 (1999) (citations omitted); In re Jessica B.,50 Conn. App. 554, 566 (1998).
Based on the clear and convincing evidence presented at trial, this court finds that DCF made reasonable efforts to reunify the family and that further efforts toward that end are inappropriate.
After the children were placed in foster care in 1994 and 1996, CT Page 49 DCF provided visitation, casework, and service referrals. Referrals were made, to no avail, for mental health evaluation and counseling, parenting, and substance abuse treatment. Neither of the parents made significant progress. The quality and quantity of the visits starkly demonstrates that reunification was a goal that could not be achieved. The children were frightened at the visits. The parents stopped visiting the children long ago.
Without question, DCF made reasonable efforts to reunify the family. The parents' conduct showed they were unwilling or unable to benefit from such efforts, which became inappropriate.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3).
DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship as to both parents. The court finds that DCF has proven each ground by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In re Migdalia M.,6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display and love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
The parents only sporadically visited their children after they CT Page 50 were placed in foster care. They made little effort to contact DCF about them. Both parents threatened DCF staff. Both stopped having contact with their children and DCF well before the petition was filed in July, 1998.
They left DCF and the foster family to care for both children. Clearly and convincingly, they have abandoned the children.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found each child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In Hector L.,53 Conn. App. 359, 366-67 (1999). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is appropriate for the court to consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it. Here, about one year and five months elapsed between the filing of the termination petition in July, 1998 and the trial in December, 1999, which is a reasonable time, especially given the ages of the children.
As the Appellate Court recently noted in In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the question is whether either Veronica D. or Johnnie J., Sr. was better able to be a parent to Johnnie J., Jr. or Mykell when the CT Page 51 petition was filed than at the time of their commitments. See Inre Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed in July, 1998, over three years after Johnnie J., Jr.'s neglect adjudication in June, 1995 and about one year and seven months after Mykell's adjudication in November, 1996.
The evidence is clear and convincing that neither parent is able to be a parent to either child and that neither could become able to do so within a reasonable time.
In accordance with the court-ordered Expectations, DCF made appropriate referrals for the parents to receive evaluations, counseling, parenting skills, and drug and alcohol abuse treatment. Mental health and medical care services were offered. The parents did not successfully complete any program. Their visits to the children were sporadic. The visits became frightening and detrimental to the children.
During all the time since they were placed in foster care, the children have had to be cared for by others. They are fortunate to be together in a loving foster home, where they are securely bonded to their foster parents.
Clearly and convincingly, the parents have not been rehabilitated. Apparently, they continue to go through life beset by major problems. It is questionable whether they can remain out of prison. They cannot assume a responsible position in the lives of their children now. They have had a more than reasonable opportunity to establish and maintain relationships with the children. There is no reason to believe that they would be able to assume responsible positions in their lives in the future.
3. No On-Going Relationship
DCF also alleges that there are no ongoing parent-child relationships between Johnnie J. Jr. or Mykell and either of their parents. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D);In re Savanna M., 55 Conn. App. 807, 815 (1999). This ground encompasses a situation in which "regardless of fault, a child CT Page 52 either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. at 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T.,51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Here, based on the foregoing findings and discussion, the evidence is clear and convincing that the required relationships between the children and their parents are absent. Johnnie J., Jr. understandably became reluctant to visit his parents. Neither child has seen either parent since 1997. They do not ask about them. They are in a solid foster home setting. Mykell has been in foster care for almost his whole life. Both children have expressed their desire to remain permanently with their foster parents, who wish to adopt them. Both children are fearful of being removed.
In deciding whether it would be in the children's best interests to permit further time for a relationship with Veronica D. and Johnnie J., Sr. to develop, the court may consider several factors. In re Savanna M., 55 Conn. App. At 816. In view of the extensive stay the children have had with their foster family, their bonded relationships with them, the total dearth of contact they have had with their biological parents, and the lack of any relationship between them, it is clearly not in their best interests to permit additional time to pass in foster care in order to allow their parents to attempt to establish a relationship with them. To the contrary, the evidence is clear that the parents have no ability to or interest in doing so.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. CT Page 53
The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124, 131 (1997). Johnnie J., Jr. and Mykell have been in legally temporary foster care for several years. Based on the foregoing findings and discussion, the court finds, by clear and convincing evidence, that termination of Veronica D.'s and Johnnie J., Sr.'s parental rights is in the children's best interests. They need and are entitled to permanency and stability in order to continue to properly develop. If the biological parents' parental rights were allowed to continue and the childrens' familial attachments to their foster family were disrupted, it could cause significant emotional damage to them. To permit this would be ignoring them as people, as well as the relationships established with their foster parents.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (d). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for the children and timely offered the parents services and visitation. These services were relevant to the needs of the parents.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation and made reasonable efforts to reunite the family, but that there was no reasonable possibility of reunification as a result of the parents' failure to utilize services and subsequent abandonment of their children.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. CT Page 54
The court-ordered Expectations were discussed above, at 4-5. As noted, DCF provided appropriate referrals and opportunities for visitation. The parents did not adhere to those Expectations. They did not keep their whereabouts known and did not keep appointments set by and with DCF. They did not visit the children regularly and then stopped altogether. They did not participate in parenting classes or individual counseling or substance abuse treatment. They did not maintain adequate housing or income. They continued to abuse drugs. Both were incarcerated after the children were placed. They did not complete either substance abuse or psychiatric evaluations.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Even before the parents stopped visiting, the visits were problematic, resulting in tearful experiences for the children. Now they are fearful that they will be removed from their foster home. They do not ask about their parents. By this time, they have no emotional ties to them of a positive nature. They are securely bonded to each other and their foster parents. Both children seek comfort. reinforcement, and nurturing from their foster family.
5) The age of the children.
Johnnie J., Jr. is now age nine; Mykell has just turned age four. Johnnie has been in foster care since 1994, Mykell since 1996. Our Supreme Court has long recognized the negative effect of prolonged temporary care of abused and neglected children. Inre Juvenile Appeal (83-CD), 189 Conn. 276, 292 (1983). Time is of the essence in custody cases. In re Alexander V.,25 Conn. App. 741, 748 (1992). It is not in the children's best interests to remain in legally temporary foster care. The children are together in a supportive environment. At their young ages, they need permanency to facilitate their ongoing development. It is evident that such a life for each of them cannot be with their biological parents.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but CT Page 55 not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitation, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds Veronica D. and Johnnie J., Sr. have not made reasonable efforts to adjust their circumstances or conditions to make it in their children's best interests to return to them in the foreseeable future. In 1997, the children were abandoned by their parents. The parents stopped making efforts to maintain contact with the children. They did not take steps to rehabilitate themselves. The opportunity to develop a significant relationship with each child was lost.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
The parents did not face unreasonable interference from each other, from any third persons, or from economic circumstances. Their predicament is a consequence of their own actions and their failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Johnnie J., Jr. and Mykell J. for terminations of parental rights to enter with respect to the mother, Veronica D., and the father, Johnnie J., Sr. Accordingly, the court hereby grants the petition to terminate the parental rights of Veronica D. and Johnnie J., Sr.
The court further orders that the Commissioner of DCF is appointed statutory parent to Johnnie J., Jr. and Mykell J. for the purpose of securing an adoptive family. If the foster family is willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and CT Page 56 federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT